UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES MAHER, individually and on behalf of other persons similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICROSOFT CORPORATION, )<br>)<br>Defendant. ) | Case No. 17-CV-00753<br><br>Judge Joan B. Gottschall |

**MEMORANDUM OPINION AND ORDER**

Defendant Microsoft Corporation ("Microsoft") operates a service called Xbox Live, which works in conjunction with its Xbox 360 video gaming console. The amended complaint ("AC") describes Xbox Live as "an online multiplayer gaming and digital media delivery service." AC ¶ 12, ECF No. 21. The plaintiff, James Maher, claims that he and other similarly situated individuals he would like to represent in a class action, *see* Fed. R. Civ. P. 23(b)(3), do not get their money's worth from Xbox Live because Microsoft cuts them off the service without refunding them for periods lasting between one and twenty-one days. Microsoft has filed a motion to compel Maher to arbitrate his individual claims under its Master Services Agreement ("MSA"). ECF. No. 24.

After reviewing the parties' initial briefing, the court ordered them to answer four questions. ECF No. 35 at 1–3. The parties have supplemented the record with evidence and argument. For the reasons discussed below, the court grants the motion to compel arbitration.

**I. FACTUAL BACKGROUND**

While signing up for Xbox Live's Silver level is free, playing with others online and other premium features requires a prepaid Xbox Live Gold subscription. Decl. of A. Holbrook

¶ 2 ("Holbrook Decl."), ECF No. 26.  Microsoft sells Xbox Live Gold subscriptions for one-, three-, six-, and twelve-month terms.  AC ¶¶ 14–15.  People can sign up for Xbox Live Gold using a credit card, or they can buy a prepaid subscription card like the one at issue here.  Holbrook Decl. ¶ 3.  A consumer buys either a physical card or downloads one and then enters a 25-character "prepaid code" (a protective layer must be scratched off to reveal the code on physical cards) printed on the card into the Xbox 360 console, the Xbox.com website, or the Xbox Windows 10 app to redeem the subscription.  *See* AC ¶¶ 16–18; Holbrook Decl. ¶¶ 3–4.

The circumstances under which Maher purchased the subscription that is the subject of his claim were not initially clear.  In supplemental briefing, Maher represents that in March 2016 he bought a twelve-month subscription card from a Best Buy store in the Chicago area.  ECF No. 38 at 10.  His son redeemed the card's code using his personal Xbox Live account, AC ¶ 22, but according to the complaint, Microsoft deliberately interrupted his Xbox Live service, effectively locking him out of it, on several occasions during the ensuing year, *see* AC ¶¶ 24, 33.

Maher brings claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.*, for unjust enrichment, and for conversion.  AC ¶¶ 47–68.  He proposes to represent two classes of Illinois purchasers of Xbox Live subscription cards, one for his ICFA claim and one for his conversion and unjust enrichment claims.  *See id.* ¶¶ 36–37 (proposing class definitions).

**A. The Prepaid Subscription Card**

Maher set forth the full text of both sides of the prepaid subscription card, which he alleges is typical of Microsoft's cards, in his amended complaint.  *See* AC ¶¶ 27–28 and the images therein.  The card does not explicitly mention arbitration or the MSA.  *See id.*  Leaving out system requirements and Microsoft's address, here is what the card's back says:

> *Games and media content sold separately. Additional subscriptions
> and/or requirements apply for some features. Multiplayer between
> Xbox One and Xbox 360 not supported. For features requiring Gold,
> see xbox.com/goldfeatures. **Free Games Offer:** Paid Gold members
> only. Active Gold membership required to play redeemed Xbox One
> games. Kinect and/or hard drive required for some games. Some
> restrictions apply. See **xbox.com/live.**
> **TO REDEEM CODE ONLINE:**
> Have a Microsoft account or Xbox Live profile? Simply log in to your
> account on **xbox.com/redeemcode** and enter the 25-digit code.
> Need an account? Go to **xbox.com/live,** follow the steps to create a
> new account, then enter the 25-digit code.
> For more information on how to redeem codes on your Xbox console,
> visit **xbox.com/howtoredeem-console.**
> **CARD HAS NO VALUE UNTIL ACTIVATED AT REGISTER.**
> **NO CREDIT CARD REQUIRED.**
> Card is not redeemable for cash, and will not be replaced if lost,
> destroyed or stolen.

AC ¶ 28 (all emphasis in original); *accord* ECF No. 33 Ex. A, B (scale and enlarged copies of card).

Microsoft confirms that its terms of sale make prepaid subscription codes nonrefundable. Suppl. Decl. of A. Holbrook ("Holbrook Suppl. Decl.") ¶ 4, ECF No. 37 (citing Terms of Sale ¶ 16, *id.* Ex. E). It adds that its customer service representatives have the discretion to accept returns. *Id.* Again, Maher represents that he bought his card at a Best Buy store, and Best Buy and other major retailers do not allow returns of Xbox Live prepaid subscription cards. Pl.'s Suppl. Resp. 10, ECF No. 38.

**B. Microsoft's Master Service Agreement**

Microsoft's MSA replaced the separate terms of service for Xbox Live effective August 1, 2015. Holbrook Decl. ¶ 5. The MSA's first page notifies the reader that it includes a "Binding Arbitration and Class Action Waiver." MSA 1. Section 15 of the MSA begins:

> **Binding Arbitration and Class Action Waiver If You Live In (or
> If a Business Your Principal Place of Business Is In) the United
> States.** We hope we never have a dispute, but if we do, you and we
> agree to try for 60 days to resolve it informally. If we can't, you

> and we agree to **binding individual arbitration before the American Arbitration Association ("AAA") under the Federal Arbitration Act ("FAA"), and not to sue in court in front of a judge or jury.** Instead, a neutral arbitrator will decide and the arbitrator's decision will be final except for a limited right of appeal under the FAA. **Class action lawsuits, class-wide arbitrations, private attorney-general actions, and any other proceeding where someone acts in a representative capacity aren't allowed. Nor is combining individual proceedings without the consent of all parties.** "We," "our," and "us" includes Microsoft, Skype (see section 10) and Microsoft's affiliates and, if you use Skype Pay by Mobile, your mobile phone carrier.
>
>> a. **Disputes Covered—Everything Except IP.** The term "dispute" is as broad is it can be. It includes any claim or controversy between you and us concerning the Services, the software related to the Services, the Services' or software's price, your Microsoft account, your Skype account, or these Terms, under any legal theory including contract, warranty, tort, statute, or regulation, **except disputes relating to the enforcement or validity of your, your licensors', our, or our licensors' intellectual property rights.**

MSA § 15 , ECF No. 26-1 (all emphasis in original); *see also id.* § 15(h) (allowing rejection of future changes to the arbitration clause by sending written notice within thirty days). The procedure includes an option allowing Microsoft to be sued in a small claims court in the county where the consumer lives. MSA § 15(c).

**C. Acceptances of the MSA**

Microsoft has submitted uncontradicted evidence that Maher took steps Microsoft deems to be an acceptance of the MSA three times. After the MSA took effect on August 1, 2015, Microsoft configured Xbox Live not to work until the user accepted the MSA by clicking an "I Accept" button next to either a link (on the web) or a button (on the Xbox 360 console) that would take the user to the MSA's full text. *See* Holbrook Decl. ¶ 7; *id.* Ex. C, D (sample screenshots of the process). Microsoft keeps a database of dates and times the "I Accept" button

is pressed. Holbrook Decl. ¶ 8.

According to Microsoft's records, Maher has three Microsoft accounts, each associated with a different Xbox Live "profile" (the difference between accounts and profiles is not entirely clear). *Id.* ¶ 9. The database shows that each account accepted the MSA once, respectively on September 1, 2015; December 8, 2015; and February 6, 2017. *Id.* Additionally, a Microsoft engineer avers that Maher's minor son could not have logged into Xbox Live and redeemed a prepaid code in March 2016 without first clicking an "I Accept" button associated with the MSA. Holbrook Decl. ¶ 10.

## II. THE FEDERAL ARBITRATION ACT

The Federal Arbitration Act (FAA) provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, "arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005); *see also Johnson v. Orkin, LLC*, 928 F. Supp. 2d 989, 1001 (N.D. Ill. 2013) ("[T]he party opposing compelled arbitration will fail if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." (internal quotation marks, ellipsis, and citation omitted)).

## III. ANALYSIS

The court begins with the question of whether Maher has an enforceable arbitration agreement with Microsoft. This should not be confused with, and should not bleed into, the

5

analytically distinct second question of whether this dispute falls within the scope of that agreement. *See Zurich Am. Ins.*, 417 F.3d at 687.

## A. Formation Principles

The court applies Illinois law to determine whether a valid, enforceable agreement exists. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (stating in FAA case in which plaintiff challenged agreement's enforceability that "contract formation is governed by state law" (citations omitted)); *Dorsey v. H.C.P. Sales, Inc.*, 46 F. Supp. 2d 804, 807 (N.D. Ill. 1999) ("We treat an agreement to arbitrate like any other contract, and look to state law to determine whether an arbitration clause is enforceable.") (citing *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 366–67 (7th Cir. 1999)). The FAA puts no thumb on the scale; "the FAA's policy in favor of arbitration applies when determining the scope of an agreement to arbitrate, but not when deciding whether there is an agreement to arbitrate in the first instance." *Druco Rests., Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)). "Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) (citing *Beverly v. Abbott Labs.*, 817 F.3d 328, 333 (7th Cir. 2016)) (other citations omitted).

## B. Maher and Microsoft Agreed to Arbitrate Disputes

As the court's questions to the parties suggested, much of the confusion on formation involves teasing out the relationships among Maher's transactions. In the first set, Maher (or someone using his account, but he doesn't dispute this) selected "I Accept" next to a link or button that would have taken him to the MSA's full text. Holbrook Decl. ¶ 9. Second, Maher bought the card at a Best Buy. *See* Maher Decl. ¶ 1, ECF No. 33-2; Suppl. Resp. 10, ECF No.

38.  The card doesn't say much of anything about arbitration.  *See* AC ¶ 28, ECF No. 33-1 Ex. A; Maher Decl. ¶¶ 2–4.  Then, in the third transaction, Maher's son redeemed the card on his own Xbox Live account.  AC ¶ 22.

Maher effectively treats these three, or at least the last two transactions, as analytically discrete from one another.  He argues, and avers, that he "did not agree to arbitrate any claims arising out of the purchase of the gift card."  Maher Decl. ¶ 6; *accord* Resp. Opp'n Mot. to Arbitrate 2, ECF No. 33.  He also says that the relevant transaction is the one-year subscription created by the card's particular prepaid code.  Pl.'s Suppl. Resp. 3, ECF No. 38.

For its part, Microsoft disclaims any reliance on the card or its packaging as giving Maher notice of the MSA's arbitration clause.  Suppl. Resp. 10, ECF No. 36.  Microsoft instead sees the first of the sets of transactions just discussed—clicking "I Accept" in September and December 2015—as an umbrella arbitration clause hanging over the later transactions, gathering them under the scope of its broad arbitration clause.

The court asked Microsoft to provide authority for the proposition that an arbitration clause can cross transactional lines, and it has done so.  Put succinctly, this authority shows that a dispute under a contract with no arbitration clause may nevertheless fall within a broadly worded arbitration clause in another contract.  *See, e.g.*, *Gore v Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032–36 (7th Cir. 2012); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002); *Gingiss Int'l., Inc. v. Bormet*, 58 F.3d 328, 312–32 (7th Cir. 1995); *Crane Sales, Inc. v. Sany Am., Inc.*, No. 15 C 859, 2015 WL 4325483, at *4 (N.D. Ill. July 15, 2015); *Lewis v. Advance Am., Cash Advance Ctrs. of Ill., Inc.*, No. 13-cv-942-JPG-SCW, 2014 WL 47125, at *3 (S.D. Ill. Jan. 6, 2014).  Indeed, the FAA contemplates agreements to arbitrate an "existing controversy," which arise out of a contract without an arbitration clause.  9 U.S.C. § 2.  This rule is well

7

established enough that a test exists for it: "where the parties enter into two agreements—though only one contains an arbitration clause, and the plaintiff brings a cause of action based, at least in part, on conduct contrary to the agreement that does not have the arbitration clause, the parties can be compelled to arbitrate only if (1) the clause itself is broad enough to encompass their dispute, or (2) the agreement containing the clause incorporates the other by reference." *Gore*, 666 F.3d at 1033 (citing *Rosenblum*, 299 F.3d at 662). As this test suggests, the interaction of the two contracts depends on the scope of the clause rather than a formation question. *See id.*; *Rosenblum*, 299 F.3d at 662. So the formation issue requires sorting out the transactions.

When Maher clicked, tapped, or otherwise selected "I Accept," he assented to the MSA three times, twice before and once after he bought the prepaid subscription card on which he sues. *See* Holbrook Decl. ¶ 9. "Courts around the country have recognized that this type of electronic 'click' can suffice to signify the acceptance of a contract." *Sgouros*, 817 F.3d at 1033 (collecting cases); *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121–22 (Ill. App. Ct. 2005) (holding online purchaser was subject to "terms of service" linked on all five pages of online checkout process where process advised that purchase would be subject to terms). Microsoft raised this point in its supplemental brief, ECF No. 36 at 10–11, and Maher's supplemental reply, ECF No. 38, does not develop an argument that the Xbox Live screens gave him insufficient notice of the MSA's terms. *Cf. Sgouros*, 817 F.3d at 1035 (applying test under Illinois law and observing that "[w]here the terms are not displayed but must be brought up by using a hyperlink, courts outside of Illinois have looked for a clear prompt directing the user to read them" (citations omitted)). Accordingly, that Maher assented to the MSA must be treated as undisputed. The court can assume for the sake of argument that Maher's Best Buy purchase and even his son's one-year subscription amount to separate contracts without arbitration clauses. That does not change the

legal effect of assenting to the MSA in a third contract; it just raises a question about the scope of the MSA's arbitration clause and whether it reaches the particular dispute, however it is properly framed. *See Gore*, 666 F.3d at 1032.

Once the knot of transactions is unraveled, it becomes clear that the click transactions in which Maher assented to the MSA are not procedurally unconscionable. Maher relies almost exclusively on the unconscionability analysis in *Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979 (N.D. Ill. 2008). That case involved two people, Jose and Dawn Trujillo, who bought cell phones and gave them as gifts to each other. *See id.* at 980–81, 984. Dawn had owned a previous phone made by the same manufacturer and received notice of the carrier's, a separate company's, terms of service before she bought the phone at issue. *See id.* at 984, 985. Jose Trujillo ("Trujillo") activated new service for himself. *Id.*

When he later sued the manufacturer, the court held that enforcing an arbitration clause in the carrier's terms of service would be procedurally unconscionable. *Id.* at 989–95. The store at which Jose bought his phone did not have paper copies of the carrier's terms of service available for him to review before buying, *id.* at 989, and although the defendant pointed to an out-of-date version on the carrier's website, it had no evidence that Trujillo had been told how to find the website, *id.* at 989–92. Trujillo made an arbitration agreement with the carrier several days later when he activated a phone he received as a gift from Dawn; the two had apparently given each other the same item as a gift. *Id.* at 991. The *Trujillo* court explained that "[b]y the time Trujillo first saw or had access to [the] service agreement, he could do nothing to unwind the earlier purchase." *Id.* at 993. The sales receipt for the phone he bought, and had already given as a gift, said that he would be charged a ten percent restocking fee for returning the phone, so the die was cast. *See id.* at 993–95 (distinguishing *Bess v. DirecTV, Inc.*, 885 N.E.2d 488 (Ill. App. Ct.

9

2008), and *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997), because, among other reasons, the plaintiff would receive a full refund if she chose to discontinue service after learning of the arbitration clause).

But unlike Jose Trujillo, Maher does not claim that he was a new Microsoft customer who had never been prompted to accept the MSA before his March 2016 prepaid card purchase. *See* Holbrook Decl. ¶ 9. He therefore stands in a position more like Dawn Trujillo who had a preexisting account with the carrier and had received a printed copy of the terms of service months before she bought her phone.[1] *See Trujillo*, 578 F. Supp. 2d at 984. Although Dawn Trujillo was not a party, the court took pains to distinguish the prepurchase notice of the carrier's terms she received from the notice Jose Trujillo received. *See id.* at 984 (emphasizing that the phone Dawn Trujillo purchased was not the one at issue there).

The record here shows that, like Dawn Trujillo, Maher received noticed of the MSA's terms twice before he purchased the subscription card at issue. *Compare* Holbrook Decl. ¶ 9, *with* Maher Decl. ¶ 1. "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777 (7th Cir. 2014). Again, Maher has never argued that the notice he received of the MSA's terms was inadequate or buried, and the court, after reviewing the MSA and the screen shots in the record, does not see a basis for finding procedural unconscionability any more than it would have for Dawn Trujillo. *See Trujillo*, 578 F. Supp. 2d at 984 (laying emphasis on the fact that Dawn Trujillo received prepurchase notice of arbitration clause while Jose Trujillo did not); *see also Hill*, 105 F.3d at 1149 (enforcing arbitration clause in box sent to consumer where consumer had adequate opportunity to unwind transaction after receipt).

---

[1] Maher does not bring this action on behalf of his minor son. AC at 1.

So Maher and Microsoft have an enforceable agreement to arbitrate some dispute. The next question is whether this dispute falls within its scope. *See* MSA § 15, Holbrook Decl. Ex. A, ECF No. 26-1.

**C. The Arbitration Clause Covers This Dispute**

"Once it is clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore*, 666 F.3d at 1032 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) and *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998)). When evaluating the scope of an arbitration clause, arbitration must be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Int'l Bhd. Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014) (quotation omitted); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960).

The arbitration clause here says in refreshingly plain English that it "is as broad as it can be." MSA § 15(a). The clause reaches "any claim or controversy between you and us concerning the Services, the software related to the Services, the Services' or software's price, your Microsoft account, your Skype account, or these Terms, under any legal theory . . . ." *Id.*

The claims here fall within the scope of the broad language of the MSA's arbitration clause. The Seventh Circuit reads "related to" language in arbitration clauses "broadly." *Gore*, 666 F.3d at 1033 (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999)). "Such broad language 'necessarily create[s] a presumption of arbitrability.'" *Id.* (quoting *Kiefer*, 174 F.3d at 910). Maher characterizes his claims as arising out of his purchase

11

of the prepaid subscription card.  Resp. Opp'n Mot. to Compel. Arb. 2, ECF No. 33; Suppl. Mem. 3, ECF No. 38.  He draws a semantic distinction.  The "substance of [Maher's] factual allegations," *Gore*, 666 F.3d at 1036, concern interruptions in Xbox Live services provided by Microsoft; it is for those interruptions and associated nondisclosure about those service interruptions that he wishes to be compensated.  *See* AC ¶¶ 22–25, 55–57, 62, 66–67.  To the degree these claims are ambiguous about whether the policies Maher challenges are unique to users of prepaid cards, that ambiguity must be resolved in favor of arbitration.  *See NextEra Energy*, 762 F.3d at 594 ("[W]here any ambiguity as to the scope of the clause exists, we will construe it in favor of the party seeking arbitration."  (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 475–76 (1989)).

## IV. CONCLUSION

For the reasons stated, Defendant Microsoft Corporation's motion to compel arbitration, ECF No. 24, is granted, and the parties are ordered to arbitrate this dispute by following the procedure in § 15 of defendant's Master Services Agreement, ECF No. 26-1.  This action is stayed pending arbitration.  The parties are directed to file a status report on the arbitration on or before June 26, 2018.


Date:  March 29, 2018 /s/
Joan B. Gottschall
United States District Judge